Your Honor, the first case of the morning called 210-353 Mary Hafferkamp v. Leah Llorca on behalf of the appellant, Mr. Thomas Lucchetti, on behalf of the Indian Catholic, Mr. Michael Spaulding. Sit down, Shannon. Good morning, Your Honors. Good morning. I'm here obviously to urge the court to reverse the trial court. And the decision denying the injunctive relief sought under this restrictive covenant, I believe that the court can easily reverse under either or any of the theories that we all know have been espoused in this case and in other cases, or excuse me, in the LSVC case. And most especially the differences of opinion shown in the decisions that were recently decided in Sunbelt and Reliable, as well as the decision of the 4th District of, excuse me, Steam Sales and Reliable and the 4th District's decision in Sunbelt. As I pointed out in my original brief, Your Honors, I think that there was a significant distinction, factual distinction between the facts of the LSVC case and this case. I believe I set out about 17 different distinguishing factors, which in my opinion indicate that the trial court's misapprehension or at least misapplication in failing to get proper weight to the various factors would require reversal. Additionally, to the extent that the Mohanty reasonableness test is applied, as I set out in my reply brief, supplemental reply brief, I believe that the appellant has shown the requisite business interest in need of protection. What is that business interest? The business interest is to maintain and continue to maintain the client interests, the clients that have been developed over a 28-year period. Many of those clients were developed by the defendant, correct? Were any? I'm sorry. Many of those clients were developed by the defendant. I believe that the testimony in that regard is that some of them were developed by her efforts. On the other hand, I believe the testimony and the evidence also was that the clients were always considered to be clients of the salon, both contractually. And those contracts, if you recall, Your Honor, went back eight years in which the same indication of the permanency of the relationship, the importance of the client development, et cetera, were contractually signed up. There's also testimony regarding loyalty of the client to either the hairdresser or the salon. Yes. Is that true? Yes, it was. How much weight should be given to that type of factor? Well, I think that there should be some weight given to it. The problem, in my view, is that the weight or that the testimony of the hairdresser was empirical based only on her experience in servicing clients. The salon brought in an outside witness who was actually a competitor of the plaintiff who testified at length regarding the loyalty being primarily to the salon as opposed to the stylist. If you had all the same factors you have in the case except for the fact you didn't have an expert who testified or any other testimony regarding loyalty, how would that affect the case? If there was no testimony at all regarding loyalty? No testimony regarding loyalty. I think that that would affect the case negatively for the stylist. And that's a fact question, right? Yes, sir. I would like to point out in my discussion of the factors that Mohanty talks about in terms of whether or not the enforcement of the covenant would present an undue hardship to the promissor, there was a typographical omission on page 7 of my brief which I'd asked the court to take consideration of. In fact, it's in the last sentence of paragraph 3. Quote, the restriction prohibits Apolli from competing for a short time and within a short distance. It does not deprive Apolli of her blank altogether. It should have been employment included in that sentence as opposed to what makes no sense. So let's talk about the restrictions within a five-mile radius. Yes. And it's for one year, correct? I'm sorry? For one year? For one year, yes. Within a five-mile radius. Yes. And you have, and we'll go back and talk about the customers, and I'm looking at the protectable interest of the salon. How about the clients that this hairstylist brought with her? How does the salon have a protectable interest in the customers that this stylist brought with? And let's speak for one moment as she left and some of the clients left with her. How do you say to these clients, you're our client, you're not her client, and maybe it's because this is kind of near and dear to my heart, how do you tell somebody who their hairstylist is going to be? I don't think that the plaintiff is seeking to tell the client who they should go to. They're just saying that if you choose to go to her, she needs to do her activities five miles outside of the radius because the testimony was, number one, that most of the clients of the plaintiff come from within that five-mile radius. And also, Your Honor, there was scan testimony, in my view, that the stylist brought any customers with her at the time of her initial employment. Did she develop the customers while she was there? Yes. And so your position would be, well, based upon our advertising and the fact that we're paying everything, the supplies, everything for her, these are potentially our customers. Yes. How do you tell the customer, because you're in contract with the hairstylist, you're not in contract with these customers, so whether it's within a one-mile radius, four-mile radius, or five-mile radius, again, how do you tell the customer, hey, you know what, you're our customer, you're not hers? So are you in contract with the customer or you're not? Of course not. And I don't think that there's been any suggestion that the enforcement of the covenant goes to the relationship between the salon and the customer. No. No, but don't you believe that when you look at the cases reliable, you look at steam sales, and you look at LSBZ in Sunbelt, but LSBZ is a little different, or the cases with the doctors. Aren't those a little different than a typical sales position? Because now you're dealing with a choice of a patient with a choice of a customer. For sure. So should we not treat those differently? Differently than salespeople? Yes. For sure. For sure. And I think that's a distinguishing characteristic, that the service provided by the stylist is a personal one, but I think that in view of the contractual relationship that existed for eight years between the salon and this particular stylist, that that is of secondary importance. The question I think that the whole issue relates to is whether or not these parties were obviously free to contract. I forget which justice in one of these opinions said, you know, the employee could have either declined to sign the covenant or asked that it be deleted, et cetera. None of those occurred here over an eight-year period. Are the restrictive covenants in a service contract or service profession, if you will, are perhaps those something that we should say you should not be able to or you should not be allowed to enter into such a contract in these types of professions? In all service professions. I think that that would be a big jump in the jurisprudence that's existed here before. Let me ask this question. What about competition within the five-mile radius? There's 25 hair salons, correct? Yes. So what harm would it be to have one more? The harm of additional competition per se, market-driven competition. Is there a policy consideration that we should look at in determining what test to apply? I think not. I think that based upon the contract that is issued here, the question in my view is a very narrow one as to whether or not the court applied, you know, the proper law or the facts of the law. What is the proper law in light of reliable saunt belt steam sales compared to LSBC? How does that change the equation? Well, I think that the cases that you just mentioned still require some showing of business interest, and I think that it's a less restrictive standard rather than going through the various factors that the LSBC case set out. Permanency and customer secrets. Yes. Wasn't there testimony that after the defendant left, there was a noticeable reduction in the business because the business was so competitive in that five-mile area? Yes. And there was also testimony that this particular stylist was the highest generating person, would generate the highest income, et cetera, for the salon. She probably, and I think this was pointed out, she had a lot of personal contacts, the employee, with these clients. Again, I hate to fall back on my personal life, but as you do with a stylist, you have a lot of personal contact as opposed to having personal contacts with the employer. So doesn't that and shouldn't that as a factor come into play, the type of relationship or the type of contacts with the employee versus with the employer? I think not given the fact that. Wasn't that a factor that they looked at in LSBC? Yes, that was a factor. Of course, none of those factors are controlling. The closeness of the contact is a factor for the court to take into consideration, but I'm not positive that there was a whole lot of testimony regarding closeness of relationship. There was plenty of testimony, however, regarding the acknowledgments and the manner in which the parties conducted their business insofar as the relationship of client versus salon versus stylist. Wasn't a big factor in LSBC the fact that the employee rented a chair and was more or less self-employed? Yes, and I think that was a big distinguishing factor in our case. There was significant testimony or admissions here regarding the amount of time that the salon needed to develop customers, clients, the significant expenditure of money for various items, et cetera. And I think that a chair renter, and that's one of the things that made the plaintiff's business unique vis-à-vis others, and that is the chair renter versus the employee-employer relationship. I thank you for your time. And I don't want by any means for you to misunderstand or think that I would be ruling on this case based upon my personal experience. I'm just throwing that out there. Same goes for barbers. That's right. Thank you. Thank you. Good morning. Good morning. May it please the Court. My name is Michael Espero, and I represent the appealee in this case, Leah Lorca. This Court can affirm the trial court's judgment on any basis it finds in the record. The trial court did not reach one of the primary arguments that we raised below, which was that this contract is unenforceable because the conditions preceding that are contained in the contract were not met. And those conditions preceding require strict compliance in order for the contract to be enforceable. The agreement provides that the restrictive covenant only kicks in if the agreement is terminated by the expiration of the initial term or any subsequent term of the agreement or by violation of the employer's standards of conduct. Wasn't it terminated when she left? Wouldn't that be a termination? Well, the agreement itself speaks to what term means. It defines term. What's the standard of review for us in reviewing the contract and its terms? I believe it's de novo. Okay. And the agreement incorporates the policy manual, correct? It does. And the policy manual addresses termination and provides for voluntary termination by the employee, correct? Yes, but there was not any testimony that there were any violations of. It's in the contract and in the policy, correct? It is. Mr. Ricchetti, in his reply brief, addressed this argument that. . . The sheer argument that it would have to be a term. So you would be leaving one year after the date is started, and that's how you interpret that language? That's right. And I believe if you read Mr. Ricchetti's reply brief, he's arguing that the contract that would be interpreted would be what he calls the penultimate contract. So not the one signed on May 28, 2009, but the one that expired as of the day before. But that's not the one we're interpreting here, and that's not the one that's in effect. And the agreement itself speaks to superseding any and all prior agreements. So the one in effect is the one signed on May 28, 2009. Our position is that neither of those conditions perceived were met. The term, as defined by the contract itself, had not expired. If we get to the restrictive covenant and whether that is enforceable. . . First, I believe that the legitimate business interest test is still the law in this district. If you look at the steam sales case, this court did not reach the issue of whether it was going to reject the legitimate business interest test. That wasn't outcome determinative with respect to that particular case. This court questioned the viability of the LVI test, though. It did. In steam sales and found that they didn't have to. This court found that there was no necessity to disregard the LVI test because in steam sales it was satisfying. That's right. But, however, in light of reliable, Mahanti, Sunbelt, how does that affect the trial court's ruling and following in lockstep LSBZ? Well, certainly Justice Zinov's opinion in reliable indicated that the legitimate business interest test survives. And even if you take all of those cases together and read them together, I think it's still clear. . . And I think I heard Mr. Lucchetti concede that there is at least some element of a predictable business interest that needs to be analyzed. So whether it's called a legitimate business interest test or a totality of the circumstances test, however it's phrased, there is still a protectable business interest that needs to be looked at. Your position is there has been no showing of a protectable interest? Well, I think that the appellant's position here is that the protectable business interest is just protecting them from competition per se. What about the investment in advertising, training, supplies, all of which were provided by the employer, none of which were provided by the employee? Those are factors. However, I think if you look at the LSBZ case, some of those factors were present. Some investment in training, some investment in developing some clientele. LSBZ involved a contractor, not an employee, correct? That's right. You know, should we just look at a business, and because a business is a particular business, disregard all other factors and just follow precedent based upon the type of business? Or should we look at all of the facts and circumstances, in other words, a totality of the circumstances test as opposed to just looking at the nature of the business? Well, I think you need to look at all the factors, but not one factor is controlled. And in a service industry like this, this is where I think LSBZ is instructive, because it was interpreting this type of service industry, a restrictive covenant in this type of service industry. Regardless of whether it was a contractual situation or employee-employer situation, it was a restrictive covenant in this type of service industry. And that's where the loyalty factor, which there's evidence of in this case, and Mr. Ruttetti referred to it as it was empirical in his words in this case. You had a loyalty factor in Mahanti, correct? Correct. Loyal to the positions, yet the Supreme Court upheld the covenant not to compete. That's true, they did. Is this more akin to that or more akin to sales? Well, I think the service industry is not akin to sales. In this case, there's no question that the time and area restrictions, even by your client's home testimony, were reasonable, correct? We didn't challenge that law. I might point out that I wrote Steem Sales and tried to go to great effort to make sure we didn't recognize the legitimate business interests, that we recognized the protectable interests. And time, distance, and protectable interests were essential elements that had to be proved. What do you think the protectable interest is in your case? Well, it's not competition per se. What was the saloon owner trying to protect? Well, certainly she's trying to protect the clientele that had come to Leah Lorca primarily out of loyalty to Leah Lorca as their personal hairstylist from following Leah wherever she went. And that seems to me like it's competition per se. And Mr. Lucchetti seemed to concede that in his argument. And that is a pure restraint of trade and a public policy issue. The problem with that is she wouldn't have had those clients but for her employment and her status as an employee, not an independent contractor but an employee of the plaintiff. She could have said, I'm not signing the contract. I'm going off on my own business. But she signed the contract where she said these customers belong to the salon, not to the stylist. That's the contract terms, correct? That is the contract terms. The contract also talks about the employee, Leah's duty to cultivate that type of clientele and concedes that there's a close personal relationship that's developed and that that is important in developing that sort of clientele. I don't think that you can look at just the contract terms and say because it says that, that it's so. You have to look at the context of this service industry here. And Justice Shostak, your questions regarding how we control what a particular client is going to do here I think are important. Who is this tailored to restrain? Is it tailored to restrain Leah or is it tailored to restrain clients from going to patron Leah at a salon within a five-mile radius? So should we have a different standard for the service industry, if you will, with respect to restrictive covenants in that they're unconscionable or against public policy? What's your position? Well, I think it's very important to look at that loyalty aspect. That factor becomes more important in the service industry. And the close personal relationship factor seems to trump the other factors. I don't want to specifically point one out and say that one is controlling. You have to look at them all, as LSBZ makes clear. But if you look at them all, in LSBC, that factor became one that was important based upon the context of that particular service industry. And that's what the trial court did here. He went down the list of those factors and said, this is LSBZ. This is a case that is on all fours with LSBZ. And he followed the precedent. You have no problem with time or distance. Is that correct? That's right. And do you have any problem with protectable interests from the standpoint of the salon owner? Well, I think the – Does she have a right to protect her interests and her investment? I think she – it needs to be more than just restricting competition per se. And I think that's what I heard Mr. Muchetti say. If that's the protectable interest – Well, how do you do it then? Well, as a matter of public policy, if I read the law in this state correctly, as a matter of public policy, any restraint on trade in and of itself, just per se, is against public policy. And I think that's the position that they're taking, and that's the testimony below. Even the expert that testified on their behalf, a man named Howard Morris, testified that's the reason we have these kinds of contracts. It's just to restrain competition. There are 10 or 12 cases out and published already. And I don't – just off the top of my head, I don't remember any one that focused solely on restraint of trade as a reason for denying restrictive – But they all make the point. They all make the point. Making a point, making a decision based on one or two, obviously, two different things. Well, that's why you have to have reasonable terms of the contract in terms of time and territory because of the public policy against restraint of trade, correct? That's – And you're not challenging the reasonableness of the time and territory. We didn't below them. We're not here. Didn't she – did she testify that it was – when she measured it, it was outside of the five miles? She did. Actually, the testimony was that she drove two alternative routes, which she believed to be the most direct routes, measured it on her car's odometer, and found those routes were outside the five miles. The contract speaks to radius. She truly believed, and I think the testimony below makes clear, that she was outside of that five-mile radius. Does the competitiveness of the business favor the salon or your client? Well, I guess based upon the loyalty to my client, in this context it favors my client because the testimony below is that a significant number of the clients that she serviced on a regular basis followed her. But that goes – and I guess this goes to Mr. Lucchetti's point where he talked about it was just this empirical evidence and the hairstylist's testimony as to this loyalty factor. But it's more than that. The testimony was that these clients actually followed her. It's not her just saying, yeah, they're loyal. It actually happened, and I think that demonstrates loyalty. The evidence was that she solicited both from her regular customers that were loyal to her and also salon customers. I don't believe so. I think the evidence was that she jotted down client names that specifically came to her, and those were the ones that she contacted. Right, that came to her, not necessarily through her, but that were customers of the salon as well. According to the terms of the contract, they were deemed customers of the salon. Right. But they were loyal to her. Right. Yes. But my point is I guess I'm looking at it in two clumps, people that she brought with her or your opponent says really didn't bring with her. She generated those customers while she was there, friends and family. And then there was another clump that were already there or that came unsolicited by her or un-garnered by her to the salon. So you have two different groups. She solicited both of those groups before she left the salon, correct? I think that's a correct statement. And there was some discussion of the breakdown of those two clumps in the briefs. And in his opening brief, Mr. Wichetti said, I don't remember the numbers, 33 of 159 or thereabouts. It works out to about 20 percent in the group that would have been given to Leah by the salon. Well, that means that the other approximately 80 percent, a significant amount, overwhelming amount, were actually developed by Leah. Despite the fact that their term, the salon's customer, she was the one that developed those particular clients. But she developed those clients while she was sitting in a building that she didn't pay rent, correct? That's right. She didn't pay utilities. True. She didn't pay for the supplies. That's right. She didn't pay for the advertising. No. So she was able to garner her business and build her business at the expense of the owner of the salon. Is that correct? In part. But the testimony also established that a lot of that development was by word of mouth, was by handing out business cards, was the family and friends that you spoke of. So I don't think it's solely due to the salon's expenses as you articulate. Also, I think her testimony was that she didn't go, I think she finds it mitigating that she didn't go to the files of the salon and pull these phone numbers. She actually looked them up herself. Right. The only, I think it is mitigating, the only information she had were the clients' names. I don't think there's any proprietary interest that the salon has in the names themselves. I mean, whether she jotted them down or remembered them and from memory knew who those clients were, you can't erase that sort of memory. I don't. But did she have to solicit them? I mean, whether she remembered the names or whether she wrote them down, she solicited them, correct? Yes. The last point I want to make is looking at steam sales in particular. That was a situation where there was an exclusive manufacturing representative of relationship. And there was this competitive advantage there based upon what were significant expenses that were valued at about $100,000 per year, trade shows, advertisements, charity events, lunch and learn type programs. The evidence there with respect to that sort of investment was much more than the sort of conclusory and glossed over evidence in this particular case. I'll call your attention to the fact that your time is up, but go ahead and finish your thought. My point is steam sales involve a unique product in a sales industry. And you compare that to one of the mill products, hair styling, the hair styling service industry, obviously clientele become loyal to their hair stylist. But I do think it's apples and oranges. And I think that you can fairly distinguish steam sales from the case of bar. I ask you to affirm from trial court. Thank you. Thank you. Your Honor, one of the questions was testimony concerning she actually driving five miles. I pointed out in my brief that there really wasn't, in fact, there wasn't testimony in that regard in the trial. Counsel in his brief suggests that, but that was based upon an affidavit that Leah Lorca had signed in relation to a motion, an emergency motion to dissolve the TRO. Was there any testimony with respect to the distance? Yes. But there's testimony concerning that, in fact, it was more than five miles outside the radius. There was no testimony by her about the driving issue that was raised here. I just wanted to point that out. And the only other point I'd like, two other points I'd like to make. One is there is no quantification in any of the case law regarding the amount of money being expended for whatever purpose, advertising, et cetera. In the big business, perhaps like steam sales, the fact that there was a number of $100,000 attached had really no significance to a small hairstyling salon in relation to the amount of money, the quantifiable amount of money being spent. And finally, on the question regarding the condition precedent having not been met, counsel indicates that the contract provided that the plaintiff's one did not supersede or did supersede prior agreements. And I think that that talks about prospective issues as opposed to it didn't say that it abrogated or vacated the prior contract. Thank you for your time. Counsel spent a lot of time on customer loyalty. Which way is customer loyalty cut, or should it be a consideration? Customer loyalty that relates to who provides the services, I think everyone indicated that it cuts toward the stylist. However, the expert indicated that, I believe he said that it's primarily to the salon. There are no other questions. I thank you again for your time. This is taken under advisement for expense and recess.